IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>$59,800.00 IN UNITED STATES CURRENCY,<br><br>                Defendant. | 8:12CV312<br><br>**MEMORANDUM AND ORDER** |

      A bench trial was held before the undersigned magistrate judge on August 17, 2015. The government's complaint seeks civil forfeiture of $59,800.00 in United States currency seized during a traffic stop that occurred on April 4, 2012, on westbound Interstate 80 in Douglas County, Nebraska. Claimant Fathi Ali Moharam, the driver and sole occupant of the vehicle, asserts he is the owner of $1200 of the money seized; Claimant Vincent J. Holmes claims ownership of the remainder.[1]

      For the reasons stated below, Moharam's and Holmes' claims will be denied, and the money seized will be ordered forfeited to the government.

## STATEMENT OF FACTS

      Having observed and heard the witnesses as they testified, and listened to the audio testimony and video exhibits, the court finds the credible evidence is as follows.

      Claimant Vincent Holmes is 61-years-old and lives in Troy, New York. He completed eighth grade at the age of 16 and dropped out of school. He later earned his GED in only four months.

---

[1] The claimants assert the total seized is actually $60,000. But two of the $100 bills seized were counterfeit. So the amount of valid currency seized totaled $59,800.

Shortly after leaving school, Holmes began collecting antiques and scavenging for potentially valuable items (including precious metals) others had discarded. He then re-sold these items for a profit. Over the years, he has sold many items to both individuals and businesses. Although he refers to himself as a "hoarder," he is willing to part with his collected items if he can make a profit. He conducts yard sales, participates in auctions, (see, e.g., Exs. 101 & 105),[2] and sells scrap metal. (See, e.g., Ex. 102). In addition to gathering antiques and collectables for resale, along with Co-claimant Moharam, Holmes purchased approximately seven or eight abandoned storage units. The claimants then distributed or sold the items in the storage shed, nearly always for a profit.

For a few years, Holmes worked for a paper product manufacturing business, earning annual wages totaling approximately $28,000. But the job ended when Holmes was injured at work in 2001. (Ex. 104, p. 2). Thereafter, he received worker's compensation payments periodically until December of 2010, when he received a lump sum settlement totaling approximately $60,000. (Exs. 104, p. 1 & 108). At the time of the seizure at issue in this case, Holmes was receiving $923 per month in social security disability payments. He lived with his aging mother, providing in-home care for her multiple medical needs.

Holmes' workers compensation and social security payments were direct-deposited into his checking account at a local bank.[3] (See Exs. 107 & 108). Holmes then withdrew part of the deposited cash and placed it in a shoe box in the basement of his mother's home. He also placed his profits from buying and selling items into the shoe

---

[2] The court reserved ruling on the admissibility of Exhibits 106 and 109. After reviewing Exhibit 106, a document created by the social security administration, the government's objections are overruled and Exhibit 106 is received. The government's relevancy objection to Exhibit 109, which identifies income received by Holmes after April 4, 2012, is sustained. Exhibit 9 is not received.

[3] Prior to receiving his lump sum settlement, Holmes' checking account was overdrawn, with a negative balance of $422.28.

box. As to the lump sum settlement deposited into his account, Holmes made store purchases and withdrawals, placing a portion of the money in his shoe box, until the account balance dwindled to a zero. Holmes presented a bank account statement, Exhibit 108, into evidence. But that account statement covers only one month, pages 2 and 3 are missing, and of the 51 withdrawals and debits Holmes made from the account between December 16, 2010 and January 17, 2011, only 14 are shown on the exhibit. (See Ex. 108). There are no bank statements of record confirming Holmes' testimony that any substantial portion of the worker's compensation lump sum settlement was withdrawn and placed in a shoe box. (Ex. 108).

Holmes withdrew cash from the shoe box to pay his day-to-day living expenses and to facilitate his nearly cash-only business[4] of buying and selling antiques and collectables. As smaller denomination bills accumulated in the shoe box, Holmes exchanged them for $100 bills and rubber-banded the bills into stacks. Holmes has never completed or filed any tax returns reporting his income from buying and selling the items he finds and collects, has limited receipts documenting these sales, and has never reported or paid any income tax on the money made from that activity.

Holmes and Moharam met in the mid-1990s and became friends. Moharam received a high school education in Yemen and came the United States in 1991. He initially lived in New York City, but moved to Troy, New York near the end of 1993. Moharam became a U.S. citizen in 2000. He can speak English, although some questions and comments must be repeated or re-phrased so he can fully understand them. Moharam can read and write English to some degree, but he is not fully proficient.

---

[4] Holmes argues his buying and selling activities are not a "business," explaining he is not conducting a business and therefore does not have to pay state or federal income tax on the profits.

Moharam worked in the grocery store business until 2006. He then opened an automobile mechanic garage in Albany, NY. When that closed in 2010, he became a taxi driver.

In October of 2011, Moharam went to Yemen. He returned to New York in late March of 2012. After returning from Yemen, Moharam met with Holmes and stated he was going to California. On April 3, 2012, Moharam began driving from New York to Fresno, California. He drove his own vehicle, and the vehicle was loaded with Moharam's personal possessions, including his clothing and a small mattress. Holmes did not accompany Moharam on the trip, was not a co-owner of the vehicle, and other than his claim to $58,600 of cash seized from the vehicle, Holmes does not assert any ownership interest in the property within Moharam's vehicle at the time of the seizure.

Moharam entered Nebraska during the early afternoon of April 4, 2012, having slept at a rest stop for only two hours the night before. He was admittedly very tired while driving and was using GPS for navigation.

As Moharam drove westbound on Interstate 80 near 24th Street in Omaha, Nebraska, he passed the parked law enforcement vehicle driven by Douglas County Deputy Sheriff Dave Wintle. Deputy Wintle is a veteran law enforcement officer and a canine officer who focuses on performing criminal interdiction work, primarily on Interstate 80. On the date of the seizure at issue, Wintle's assigned canine partner was Kubo.

Deputy Wintle and Kubo had worked together since 2006. Kubo, a Belgian Malinois, was certified to perform narcotics detention work in October of 2006 and was periodically tested and recertified annually thereafter. Kubo always passed his certification testing, and always completed the narcotics detection work he was commanded to perform. Once or twice a year, between Kubo's annual recertification

4

dates, Kubo was tested using $25,000 of circulated currency obtained by the sheriff's office from a local Omaha bank. Kubo consistently indicated to the odor of drugs on currency, but not to currency (circulated or uncirculated) alone.

Deputy Wintle was watching for cross-country moving vehicles and noticed Moharam's vehicle as it passed. Deputy Wintle entered the interstate traffic, followed Moharam's vehicle, and monitored its movements. At approximately the 50th to 60th street area, Deputy Wintle noticed Moharam's vehicle was less than a car length from the vehicle it was following. Deputy Wintle followed Moharam for approximately three miles while looking for a convenient and safe place to conduct a traffic stop for following too closely – a violation of Nebraska state law. At approximately 90th street, the deputy activated his overhead lights which, in turn, activated his in-car camera. (See Ex. 1). Moharam pulled over immediately.

Deputy Wintle approached the passenger side of Moharam's vehicle and asked for Moharam's driver's license and vehicle registration. Moharam complied. The officer then asked Moharam to sit in the front passenger seat of the officer's patrol vehicle. Moharam again complied.

While completing a warning ticket in the patrol vehicle, Deputy Wintle requested a criminal records and vehicle check from dispatch and asked Moharam about the purpose, origin, and destination of his trip. Moharam stated he was traveling to California. When asked about the specific California destination, Moharam hesitated and then said he was heading to Fresno, California. Moharam provided a variety of reasons for going to California, including to vacation, visit with a friend, find work, or move there. Moharam stated he would be in California for a couple weeks, or he may stay there for an indefinite period. Based on the lack of any definite travel plans, Deputy Wintle became suspicious.

After the record check was completed (with no wants, warrants, or criminal record reported), Deputy Wintle advised Moharam that he would be receiving a warning ticket for following too closely. In response to the officer's questions, Moharam denied having any drugs or guns in the vehicle. The officer also asked:

> Officer: Any large amounts of cash in the car?
>
> Moharam: No.
>
> Officer: Anything over ten thousand dollars?
>
> Moharam: Nothing. I don't know where I get money from. I just . . . no money. It's just hard to get some money these days anyways.

(Ex. 1, 14:21:15-14:22:20). Deputy Wintle asked if he could search the vehicle. Moharam consented to the search.

After completing the warning ticket, Deputy Wintle handed it, along with his driver's license and vehicle registration, to Moharam. The deputy repeated his request to search the vehicle. Moharam consented again. Deputy Wintle asked if he could perform a canine search. Moharam consented, adamantly stating there were no drugs in the vehicle.

Deputy Wintle deployed Kubo to perform a canine sniff. Kubo uses "passive indication" to notify the officer of the odor of drugs—meaning he typically sits and stares at the source of the odor. Kubo indicated to the odor of drugs at right rear side of the vehicle.

After returning Kubo to the patrol vehicle, Deputy Wintle again addressed Moharam:

> Officer: Alright. Hey uh . . . you said uh that you don't have any drugs or guns in the car or large amounts of cash.
>
> Moharam: No. I don't!

6

(Ex. 1, 14:24:05). The officer presented a written consent to search form to Moharam and asked if he was willing to sign it. Since Moharam was not confident with his ability to read English and did not want to sign a written consent form, Deputy Wintle relied on Moharam's multiple verbal consents to a vehicle search and called for backup assistance.

Approximately ten minutes later, a second officer arrived at the scene and the vehicle search began. The vehicle had a "lived-in look" consistent with criminal activity; that Moharam was moving quickly and with no interest in stopping to avoid contact with law enforcement officers. The officers found laundry detergent, fabric softener, and clothes hangers in the front passenger area, trash bags filled with clothing, and three cell phones (two of which were laying on the passenger seat). A mattress was located in the van's back passenger area. (Exs. 4-9).[5] Based on Deputy Wintle's experience, detergent is often used as a masking agent and possession of multiple cell phones is consistent with criminal drug distribution activity. But the law enforcement officers never attempted to determine if the cell phones contained any information indicative of illegal drug activity or were even operational.

The officers noticed tooling marks on the screws of the vehicle's lift gate cover. Based on their training and experience, the officers knew the lift gate area provided a void for carrying contraband. The officers removed the screws and pulled the plastic lift gate molding from the metal exterior. (See Exs. 10, 14). Within a hollow void in the lift gate, the officers found two rubber-banded black garbage bags, each containing rubber-banded stacks of U.S. currency. (See Exs. 11 (upper right corner of photo), 15, 16 & 17). No illegal drugs, drug records, scales, or address ledgers were found in the vehicle, and other than the laundry detergent and fabric softener in the front passenger seat location,

---

[5] All items depicted in the vehicle were present at the time of the stop. However, the photographs were taken after the search and the items were re-arranged by the officers during the search.

7

the officers found no items frequently used as masking agents (e.g., coffee grounds, dryer sheets, etc.).[6]

After finding the currency, Deputy Wintle returned to his patrol vehicle. Moharam then announced, "That's my money. . . Me and somebody else's." Deputy Wintle asked, "How much is in there?" Moharam responded, "$60,000." (Ex. 1).

Deputy Wintle advised Moharam of his Miranda rights, specifically stating Moharam was not under arrest but he was being detained, and he did not have to answer the officer's questions. Moharam acknowledged that he understood. In response to further questions about the money, Moharam stated he owned part of the money and "Azi," who was oversees, owned the rest. (Ex. 1). The vehicle was towed and Moharam was transported to the sheriff's office.

While at the sheriff's office, Moharam was questioned by Deputy Wintle. In response to interrogation, Moharam stated he was driving from New York to Fresno to visit a female friend, Lori. He did not know his friend's address, but stated he could find it if allowed to call Lori from his cell phone. He did not know Lori's last name or phone number, but stated the number was on his phone. Moharam explained that he planned to stay at a motel in Fresno, and he planned to look for work in California—perhaps as a handyman.

When asked about the currency, Moharam stated the money was owned by someone whose last name starts with an "H." He stated the money was owned by Viz (Vince), a friend of his from New York, but he could not provide the last name or a phone number for Viz. Moharam stated he was not asked to do anything with the money

---

[6] There is no evidence of record identifying the serial numbers and years of the $100 bills found in the vehicle, and whether those numbers support Holmes' claim that he collected that money over a span of three decades.

8

other than hide it for Viz, and he was not being paid to hide the money. Moharam claimed the money had been hidden in his vehicle since October, and that he owned $6000 or $7000 of the cash, the rest being owned by Viz.

Moharam stated he was keeping the money until Viz wanted it returned, and he planned to call Viz when he arrived in California. Moharam stated Viz was out of the country, but he did not know the country to which Viz had travelled. Moharam stated Viz had received the money from a settlement.

In response to Deputy Wintle's request, Moharam consented to a search of his cell phone and his GPS. Neither was searched.

At trial, the claimants testified that when Moharam returned from Yemen and told Holmes that he was heading for California, Holmes asked if Moharam would consider starting a grocery business in California: Holmes would provide the cash if Moharam ran the business. Holmes would then move to California and join in operating the business after his mother died. The claimants state they agreed to this arrangement. But it was never committed to writing, no specific California location was chosen (other than somewhere without snow), and there was no deadline for either starting the business or returning Holmes' money. Holmes testified that he emptied his shoe box and handed the cash to Moharam just before he left for California, and Moharam then re-banded the cash and hid it in the lift gate of his vehicle.

The government asserts "the Defendant property is forfeitable as facilitating property or [as] proceeds traceable to the Claimant's exchange of a controlled substance," ([Filing No. 61, at CM/ECF p. 2](#)), and the claimants are not innocent owners of the seized money. The claimants argue the traffic stop of Moharam's vehicle violated the Fourth

Amendment,[7] there is no connection between the money seized and illegal drug activity, and as innocent owners, they are entitled to have their money returned.

    1.    <u>The Traffic Stop</u>.

Both claimants argue Deputy Wintle lacked probable cause to initiate a traffic stop of Moharam's vehicle. As an initial matter, the government argues that Holmes, who was not present at the time of the stop and did not own the vehicle, has no standing to raise a valid Fourth Amendment violation.

"Fourth Amendment rights are personal and may not be vicariously asserted." United States v. Ruiz-Zarate, 678 F.3d 683, 689 (8th Cir. 2012) (citing United States v. Randolph, 628 F.3d 1022, 1026 (8th Cir. 2011)). To challenge a search or seizure under the Fourth Amendment, Holmes "must show that (1) he has a reasonable expectation of privacy in the areas searched or the items seized, and (2) society is prepared to accept the expectation of privacy as objectively reasonable." Ruiz-Zarate, 678 F.3d at 689 (citing United States v. Stults, 575 F.3d 834, 842 (8th Cir. 2009)).

Holmes was not detained by the traffic stop, and lacks any reasonable expectation of privacy in Moharam's vehicle. Holmes did not own Moharam's vehicle and was not near it at the time of the traffic stop. He cannot raise a Fourth Amendment claim for an alleged illegal traffic stop. Ruiz-Zarate, 678 F.3d at 689.

Moharam claims he did not commit a traffic violation and therefore Deputy Wintle violated Moharam's Fourth Amendment rights by stopping his vehicle. "An officer's

---

[7] The Fourth Amendment claim was not raised in the Pretrial Order, (Filing No. 61), but the validity of the traffic stop was litigated and argued by the parties. The court will therefore address this issue. Other than challenging the traffic stop itself, the claimants did not raise any other Fourth or Fifth Amendment arguments at trial.

observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004). Deputy Wintle observed Moharam driving less than a car length behind another vehicle. Following another vehicle too closely is a traffic violation under Nebraska law. Barragan, 379 F.3d at 528 (applying Nebraska law). Deputy Wintle had probable cause to stop Moharam's vehicle, and did not violate Moharam's Fourth Amendment rights by initiating the traffic stop. Barragan, 379 F.3d at 528.

### 2. Funds Subject To Forfeiture.

The United States alleges the defendant Currency is subject to forfeiture under 21 U.S.C. § 881(a)(6), which states:

> The following property shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All monies, . . . furnished or intended to be furnished by any person in exchange for controlled substance . . ., all proceeds traceable to such an exchange, and all monies, . . . used or intended to be used to facilitate any violation of [controlled substances used in violation of Title 21].

21 U.S.C. § 881(a)(6). To prevail in a forfeiture action, the government must establish by a preponderance of the evidence that the seized property is substantially connected to drug trafficking. 18 U.S.C. § 983(c)(1) & (3). Circumstantial evidence can be used to establish the burden of proof. United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501 (8th Cir. 2004). While the government does not necessarily have to show a connection between the seized property and a specific drug transaction, (United States v. $150,660.00 in U.S. Currency, 980 F.2d 1200, 1205 (8th Cir. 1992)), if the government's theory about past or planned drug-related use of the money is based on mere speculation, the seized money is not subject to forfeiture. United States v. $48,100.00 in U.S. Currency, 756 F.3d at 655. "Forfeitures are not favored; they should be enforced only

11

when within both the letter and spirit of the law." United States v. $48,100.00 in U.S. Currency, 756 F.3d at 653. The court considers the totality of the evidence and circumstances, applying common sense considerations, when deciding whether the government has proved a connection between the seized property and illegal drug activity. United States v. $48,100.00 in U.S. Currency, 756 F.3d 650, 653 (8th Cir. 2014).

Moharam was driving, with virtually no stops, from New York to California—a known route and direction for transporting drug-related currency. He was both hesitant and vague when explaining the purpose of the trip, where he intended to go, or how long he intended to be there.[8] Before the money was found, Moharam had denied (twice) that any large amounts of money were within the vehicle. A reliable and certified drug dog detected the odor of illegal drugs in the vehicle's lift gate area. During the vehicle search, Deputy Wintle found $59,800 wrapped in plastic bags, rubber-banded in groups of $50 and $100 bills, and concealed within a void in the vehicle's lift gate. Only then did Moharam acknowledge there was $60,000 in the vehicle.

While speaking with the officer at the sheriff's office, Moharam stated he owned $6000 to $7000 of the money, the rest being owned by Viz. He stated he was going to look for a job as a handyman once he arrived in California, and he was not asked to do anything with the money other than hide it for Viz. He claimed the money had been hidden in the van since October of 2011. But at trial, Moharam testified he owned $1200 of the money and Holmes owned the rest; the money was placed in the van just prior to

---

[8] At the time of trial, Deputy Wintle was cross-examined about erroneously reporting that Moharam was from Saudi Arabia. Moharam testified that he is from Yemen and has never been to Saudi Arabia. This discrepancy is likely explained by listening to Exhibit 1. During the traffic stop, Moharam stated he was from "Arabia," (Ex. 1, 14:15). Deputy Wintle may have assumed Morharam was referring to Saudi Arabia. But Moharam may have used the term "Arabia" to describe the peninsula that includes both Saudi Arabia, Yemen, and other countries.

12

leaving New York; and Moharam and Holmes planned to invest the money to open a grocery store.

Both Moharam and Holmes were unemployed at the time of the traffic stop. Holmes' peak wage earning year was 2001, when he made annual earnings of approximately $28,000. His accumulated wages for the entire decade that followed totaled less than $15,000. (Ex. 106). Although he claimed he hated banks, Holmes did not withdraw all of his money from the bank when given an opportunity to do so. Instead, after receiving a lump sum settlement of funds, he used his account to make purchases, pay insurance premiums, and withdraw money until, as he testified, the account dwindled to zero. There are no records supporting his claim that he had accumulated, in a shoe box, nearly $60,000 from selling collectables and antiques. His bank account had a negative balance as of December 16, 2010, his receipts offered at trial do not support such a large accumulation of cash, (see, e.g., Ex. 105), and he never reported any of this alleged sales income on any income tax returns.

Moharam and Holmes testified that they intended to purchase a grocery store in California; with no deadline or specific California location for starting the business, and no timeframe when Holmes was to join Moharam in operating the business Nothing was in writing.

Facts supporting forfeiture include, for example, finding a substantial amount of concealed currency, cash bundled and wrapped in rubber bands, and currency packaged in plastic or heat-sealed bags; a claimant's dishonesty about the existence of the currency or providing an untruthful story, and a claimant traveling on a known drug distribution route. See, United States v. 124,7000 in U.S. Currency, 458 F.3d 822, 826 (2006)(finding a substantial connection between a drug trafficking offense and the currency where currency was concealed in aluminum foil inside cooler, a dog alerted to currency, driver flew one-way then drove a rental, leased by someone else, to return,

13

driver lied about having money in car, and, although he stated he carried cash to buy refrigerated truck for produce business, he was unable to identify key party in such transaction); United States v. $117,920.00 in U.S. Currency, 413 F.3d 826 (8th Cir. 2005) (finding facts supporting forfeiture included seized money found hidden beneath clothing, wrapped in a plastic sack, and in a piece of luggage and evidence of concealment by the claimant); United States v. $141,770.00 in U.S. Currency, 157 F.3d 600 (8th Cir. 1998) ("[T]he government presented evidence that the camper had originated in California, a drug source state, and was on its way back to California with a very large amount of cash after having spent the time in the upper Midwest, a drug destination area."); United States v. $12,390.00 in U.S. Currency, 956 F.2d 801 (8th Cir. 1992) (noting that currency wrapped in rubber bands was characteristic of the way drug money is stored).

"Possession of large amounts of currency provides strong evidence of a connection between the currency and drug activity." United States v. $63,530.00 in U.S. Currency, 781 F.3d 949, 955 (8th Cir. 2015). But where the owner credibly explains that he does not trust banks, and there is no dispute that the currency was derived from legitimate sources:

> [M]erely travelling with a large sum in currency does not by itself weigh more in favor of [Claimant] intending to use the currency to facilitate drug-trafficking. Nor do the methods of bundling and concealment weigh more heavily in favor of [Claimants] intending to use the currency to facilitate drug-trafficking. If one were to travel with a large sum in currency, common sense would support having a method of keeping it organized while carrying and concealing it from would-be thieves.

United States v. $48,100.00 in U.S. Currency, 756 F.3d at 654.

Having heard and observed the claimants' testimony, the court finds that unlike the claimant in United States v. $48,100.00 in U.S. Currency, Holmes' claim that he does

14

not trust or use banks is not credible, nor is his explanation of how he legitimately accumulated $60,000. Holmes' testimony about the accumulated amounts in the shoe box and his aversion to banks was not supported by his exhibits, or by his stated or reported income stream. And Moharam's claim to the seized money is not credible: He lied about having money in the vehicle; then stated the money was his; then stated he owned $6000 to $7000 of the money, the rest belonging to Azi; and then stated he owned $1200, the rest belonging to Viz (presumably Vince). Moharam's trial testimony did not match his statements to Deputy Wintle during the traffic stop, (Ex. 1), or during his interview at the sheriff's office, (Ex. 2). And the traffic stop statements did not match the interview statements. Finally, the claimants' alleged grocery store plan—with no timeline, no location, and nothing in writing—was not mentioned during the traffic stop and is implausible; particularly when Holmes testified that he would never trust someone else to care for or hold onto his money.

Under United States v. $48,100.00 in U.S. Currency, the question then becomes, "Why did they lie?"

> Put another way, [Claimants] could have been travelling for any reason [they] would not want to share with law enforcement, e.g., drug trafficking, guns, stalking, stolen goods, or any of a number of unlawful or embarrassing activities. Finding [their] proffered reason for travel not credible means any other reason is possible.

United States v. $48,100.00 in U.S. Currency, 756 F.3d at 655. In the absence of some affirmative evidence of past or planned use of the money for illegal drug activity, Claimants' lack of credibility "does not necessarily weigh in favor of the government's drug trafficking theory." United States v. $48,100.00 in U.S. Currency, 756 F.3d at 655.

Multiple cell phones may indicate illegal drug trafficking, but Moharam testified that only one of his three cell phones worked, and the others were simply personal property he gathered up when packing for his move to California. The phones were

15

never searched to confirm or refute Moharam's statements.[9]  No guns, ledgers, packaging, drugs, or masking agents were found in the vehicle.  Detergent and fabric softener (located with hangers) in the front of the vehicle is indicative of preparing to do laundry, not attempting to mask a drug odor on currency located in the rear of the vehicle.

But unlike the currency in United States v. $48,100.00 in U.S. Currency, a drug dog indicated to the location and drug odor of the currency within Moharam's vehicle. The Eighth Circuit has "recognized the potential limitations of a drug dog's alert by characterizing it as 'some—albeit slight—indication' of drug activity," but it "still recognize[s] that an alert carries weight in considering whether a substantial connection exists." United States v. $63,530.00 in U.S. Currency, 781 F.3d 949, 956 (8th Cir. 2015). Kubo was a trained and certified drug dog.  His training and testing included sniffing currency, and while Kubo alerted if currency had a known connection to illegal drugs, during his testing, Kubo did not alert or indicate to the odor of drugs on uncirculated currency or circulated currency withdrawn from an Omaha bank.

Based on the totality of the evidence  including the drug dog's indication to the location of the currency; the amount, concealment, bundling, and packaging of the cash; the fabricated and inconsistent explanations proffered during the traffic stop and at trial regarding the source of the hidden currency and why it was being transported, in cash, to California—the court finds the government has proved, by a preponderance of the evidence, that a connection exists between the seized currency and illegal drug activity.

---

[9] Moharam also granted consent to search the vehicle's GPS to see where it had travelled, but that was never done.

3.      The "Innocent Owner" Defense.

If the government meets its burden, the claimants may nonetheless prevail if they prove, by a preponderance of the evidence, that they are "innocent owners" of the seized currency. 18 U.S.C. § 983(d)(1). An "innocent owner" is "an owner who (i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." U.S.C. § 983(d)(2)(A). Under the civil forfeiture statute, the term "owner" to include "a person with an ownership interest in the specific property sought to be forfeited," and to exclude "a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983(d) (6)(A) and (B); United States v. One Lincoln Navigator, 328 F.3d 1011, 1014 (8th Cir.2003).

The claimants' testimony supports a joint, rather than independent, decision on concealing and transporting the seized cash. There is no credible evidence that either was unaware of the connection between the currency and drug-related activity, or that they attempted to terminate that use of the cash. The claimants have failed to prove the innocent owner defense.

## CONCLUSION

The court finds a connection exists between the defendant currency and drug-related activity. The money must be forfeited to the government.

17

Accordingly,

IT IS ORDERED:

1) The claim of Fathi Ali Moharam, against defendant $59,600 in U.S. Currency, (Filing No. 10), is denied and dismissed.

2) The claim of Vincent J. Holmes against defendant $59,600 in U.S. Currency, (Filing No. 21), is denied and dismissed.

3) Judgment will be entered in accordance with this memorandum and order.

September 17, 2015.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.